THE CHICAGO, ROCK ISLAND & PACIFIC RAILWAY COMPANY v. JOHN W. HUBBELL.

1. CARRIERS — *Interstate-Commerce Act — Void Contract.* A contract for the transportation of freight from a point in Missouri to a point in Kansas for a rate less than that demanded and collected from other persons for a like service at the same time, where the usual rate is not unreasonable nor excessive, violates the provisions of the interstate-commerce act, and is utterly void.

2. —————— *Mistake of Agent.* The fact that a special rate was offered the plaintiff by mistake of the agent of one of two connecting lines of railroad cannot give any added force to the contract. A contract made by mistake can have no greater validity than one intentionally entered into.

3. FREIGHT RATE, *Not Excessive.* A joint tariff rate of $2.70 per ton on shipments of coal between Richmond, Mo., and Mankato, Kas., had been agreed on, and was in force and in use by the St. Joseph, St. Louis & Santa Fé Railroad Company, which operated a line from Richmond, Mo., to St. Joseph, Mo., and the Chicago, Rock Island & Pacific Railway Company, which operated a connecting line from St. Joseph, Mo., to Mankato, Kas. The agent of the first-named company, by mistake, quoted the plaintiff a rate of $1.70 per ton on car-load shipments of coal from Richmond to Mankato. The plaintiff thereupon shipped 10 car loads. *Held,* That the Rock Island company is in no manner affected by such mistake, but is entitled to collect the full, customary rate, there being no pretense that such rate is excessive or unreasonable.

*Error from Jewell District Court.*

THE defendant in error, John W. Hubbell, who was plaintiff below, is a dealer in soft coal at Richmond, Mo. About the 1st of August, 1889, he applied to the agent of the St. Joseph, St. Louis & Santa Fé Railroad Company at Richmond for special rates on coal to Mankato, Kas. Being informed by the agent that he had no special rate, Hubbell wrote to the general agent, asking for a rate. He received in answer a letter quoting a rate of $1.70 per ton. He thereupon, on the 12th of August, shipped 10 car loads, containing in all 250 tons, consigned to himself at Mankato. The regular rate on coal between Richmond and Mankato was $2.70

per ton, and the quotation was made through a mistake of the stenographer in writing the letter to the plaintiff. The waybills were made out showing the rate $2.70 per ton. Under a joint tariff agreement in force between the St. Joseph, St. Louis & Santa Fé Company and the plaintiff in error, 75 cents per ton was the share to which the Santa Fé was entitled, and the balance belonged to the Rock Island. The Rock Island paid the Santa Fé company its proportion of the charges. When the coal reached its destination, the plaintiff tendered the amount of freight computed at the rate of $1.70 per ton. This tender being refused, he brought this action to recover possession of the coal. The case was tried by a jury, who by their general verdict found that the defendant had a special ownership in the property of $487.50. They also returned answers to special questions, as follows:

"1. Over what lines of railway did the coal in controversy pass in transit from Richmond, Mo., to Mankato, Kas.? A. Over the St. Joseph, St. Louis & Santa Fé railroad from Richmond, Mo., to St. Joseph, Mo., and over the Chicago, Rock Island & Pacific railway from St. Joseph, Mo., to Mankato, Kas.

"2. What was the date of shipment of said coal, and when did it arrive in Mankato, Kas.? A. It was shipped on the 12th day of August, 1889, and part of it arrived in Mankato, Kas., on the 13th, part on the 14th, and the remainder on the 15th of August, 1889.

"3. At the time of the shipment of said coal, was there in force a joint tariff of rates for the transportation of coal from Richmond, Mo., to Mankato, Kas., established by the St. Joseph, St. Louis & Santa Fé Railroad Company, and the Chicago, Rock Island & Pacific Railway Company? A. Yes.

"4. If you answer the last question in the affirmative, then what was the tariff rate on coal from Richmond, Mo., to Mankato, Kas., as shown by such joint tariff? A. $2.70.

"5. If there was a joint tariff in force at the time of the shipment of the coal in controversy, fixing the tariff on coal from Richmond, Mo., to Mankato, Kas., did the plaintiff know of the existence of such joint tariff at the time he shipped the coal in question from Richmond, Mo., to Mankato, Kas.? A. No.

"6. At the time the defendant, the Chicago, Rock Island & Pacific Railway Company, received the coal in controversy from the St. Joseph, St. Louis & Santa Fé Railroad Company and transported it to Mankato, Kas., did defendant have any knowledge of any special contract or agreement made by the plaintiff and the St. Joseph, St. Louis & Santa Fé Railroad Company to transport the coal in controversy from Richmond, Mo., to Mankato, Kas., for less than the tariff rate of $2.70 per ton? A. No.

"7. If the defendant had any such knowledge, when and how did it obtain the same? A. When the demand was made for the coal.

"8. What portion of the joint tariff rate of $2.70 per ton was to go to the defendant, the Chicago, Rock Island & Pacific Railway Company and what portion to the St. Joseph, St. Louis & Santa Fé Railroad Company? A. $1.95 to the Chicago, Rock Island & Pacific railway; $0 75 to St. Joseph, St. Louis & Santa Fé railway.

"9. What was the usual and ordinary charge for transporting coal from St. Joseph, Mo., to Mankato, Kas., over the line of the Chicago, Rock Island & Pacific railway without regard to the joint tariff offered in evidence? A. $2.

"10. Was the rate of $1.70 per ton quoted by the agent of the St. Joseph, St. Louis & Santa Fé Railroad Company to the plaintiff quoted by mistake or was it intentionally so quoted? A. Yes; by mistake."

On motion of the defendant, the court set aside the answer to the fifth question, but refused to allow the defendant the full amount of freight charges claimed, and entered judgment in accordance with the general verdict. The railway company brings the case here for review.

*M. A. Low,* and *W. F. Evans,* for plaintiff in error.

*T. S. Kirkpatrick,* for defendant in error.

The opinion of the court was delivered by

ALLEN, J.: Section 2 of chapter 104 of the acts of the second session of the forty-ninth congress, entitled "An act to regulate commerce," (24 U. S. Stat. at Large, p. 379,) reads as follows:

"SEC. 2. That if any common carrier, subject to the

provisions of this act, shall directly, or indirectly, by any special rate, rebate, drawback. or other device, charge, demand, collect or receive from any person, or persons, a greater or less compensation for any service rendered, or to be rendered in the transportation of passengers, or property, subject to the provisions of this act than it charges, demands, collects or receives from any other person, or persons, for doing for him or them a like and contemporaneous service in the transportation of a like kind of traffic, under substantially similar circumstances and conditions, such common carrier shall be deemed guilty of unjust discrimination, which is hereby prohibited and declared to be unlawful."

By § 10 of the act, a fine for a violation of its provisions of not exceeding $5,000 is provided.

The sole question to be considered in this case is whether the plaintiff, having obtained, through a mistake of a clerk of the St. Joseph, St. Louis & Santa Fé Company, a rate on shipments of coal $1 per ton below the customary rate, can enforce a contract giving him such special rate against the plaintiff in error, which received and transported the coal, and paid to the connecting company its charges without notice of any special agreement. We are clearly of the opinion that the interstate-commerce act applies as well to different companies transporting freight over connecting lines of road under a general agreement as to single carriers operating a line extending into different states. But, in any event, the Rock Island company, which received the coal in Missouri and transported it into Kansas, is unquestionably within the terms of the act. No question is presented in the record, nor was any claim made at the trial, that the rate fixed in the joint tariff in use by these two railroad companies was unreasonable or excessive, and therefore obnoxious to the provisions of the first section of the act above referred to. The claim of the plaintiff below rested solely on his special contract, and he now urges that, he will be subjected to a financial loss by this operation, if his special contract is not enforced. He also urges that, having been induced to make the shipment by the agent of the railroad company, if the

rate quoted him was a mistake, the company rather than he should suffer from it.

There is no pretense in this case that the Rock Island company in any manner authorized any variation from the established rate of $2.70 per ton. Whatever cause of action the plaintiff might possibly have against the Santa Fé company for misleading him as to the rate, the rights of the parties in this action must be determined under the provisions of the interstate-commerce law, in accordance with the usual and established rate of charges for transporting coal between the two points named. While it may be that, if the rate agreed upon by the two railroad companies were shown to be excessive and extortionate, the companies would not be allowed to enforce it as against the plaintiff, even though they were in the habit of demanding such excessive rate from other parties; yet, where no question of that kind is raised, nothing can be clearer than that the railroad company is prohibited, by the section of the act of congress just quoted, from demanding or receiving from the plaintiff a less sum than it demanded and collected from others for a like service at that time.

3. Freight rate, not excessive.

1. Carriers—interstate-commerce act— void contract.

The only point on which there was any substantial conflict in the evidence is that covered by the fifth question and answer. This finding the court set aside. We think the question as to whether or not the plaintiff knew of the existence of the joint tariff at the time he shipped the coal is wholly unimportant. There was an established rate governing all shipments. The plaintiff, in his postal card, asked for a good rate. He says the agent of the railroad company at Richmond told him he had no special rate. The agent of the company testifies that the plaintiff was informed what the regular rate was. The plaintiff is presumed to have known the law, and that under it a contract granting to him an especial favor would subject the railroad company or its agent to punishment. Under the act of congress, all contracts discriminating either against or in favor of any ship-

per are unlawful, and the persons making such contracts on behalf of the corporation are liable to punishment. It was the plaintiff who was seeking to enforce the unlawful contract. There was no pretense that the defendant was a party to that contract. The contract, being in violation of the express provisions of the law, was utterly void between the immediate parties to it. (*Hawley v. Coal Co.*, 48 Kas. 593.)

It would be absurd to hold that a contract made between the plaintiff and the Santa Fé company which is void because expressly prohibited by law may yet be enforced by one of those parties against the Rock Island company. The officers of the plaintiff in error would be liable to punishment under the provisions of § 10 of this act if they were to demand, collect or receive from the plaintiff below a less sum than they demanded, collected or received from any other person shipping coal under like circumstances between the same points.

2. Mistake of agent. Under the undisputed facts of this case, the rate quoted the plaintiff by mistake was unlawful. Had it been intentional on the part of the general agent of the Santa Fé company, it still could not have been enforced against the Rock Island company. It would have been an unlawful discrimination, which the interstate commerce act was designed especially to prohibit. The facts having been specially found by the jury, it remains only for this court to direct the entry of the proper judgment. It is ordered that the judgment of the trial court be so modified as to show that the special interest of the defendant in the property in controversy at the time of the commencement of the action was $675.

All the Justices concurring.